IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICOLE LEE MOORE, | : | No. 4:14-cv-01318 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | (Judge Brann) |
| | : | |
| CVS RX SERVICES, INC., | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

October 30, 2015

This decision evaluates Defendant CVS Rx Services, Inc.'s Motion for

Summary Judgment as to Plaintiff and former employee Nicole L. Moore's

lawsuit, filed pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C.

§§ 12101, et seq. Because there are no genuine disputes of material fact precluding

summary judgment, Defendant's Motion for Summary Judgment is granted in full.

**I. BACKGROUND**

**A. Plaintiff's Employment with Defendant**

Plaintiff began working for Defendant as a "picker" in its Chemung

Distribution Center in Waverly, New York in June 2011. ECF No. 24 at 2; ECF

No. 30 Ex. 1 at 2. Defendant's official position summary for the "picker" job

describes the role as requiring "frequent-medium heavy lifting heavy lifting

requirement of 1–20 lbs., 34-66% of time" as well as "[o]ccasional very heavy

lifting requirement of up to 75 lbs, 0-33% of time." ECF No. 24 Ex. 2 at 1. "Other

physical activities include constant bending/reaching/stooping, (67-100%)" and

"[c]onstant walking/standing climbing." Id. That same document lists the

following tasks as "essential functions" of the picker job: "using totes or cardboard

boxes, proceed down aisle to select and remove merchandise from shelf"; "pack

merchandise into totes"; "snap cover on completed tote"; and "push onto conveyor,

among other tasks." Id.

Plaintiff's testimony corroborated this job description. When asked to

estimate the number of times a day she would have to climb shelves to select

products, she responded "too many to count." ECF No. 33 at 7. Plaintiff further

confirmed that she would stock and lift her own totes, which weighed

approximately ten pounds each after she distributed the weight among several

bags. Id. Plaintiff would repeat this process approximately once every hour to an

hour and a half. Id.

## B. Plaintiff's First Leave

During her pregnancy in early 2012, Plaintiff suffered from round ligament

syndrome (a condition in which the muscles in the stomach have difficulty

expanding), a rib that stuck out too far, and gallstones. ECF No. 24 at 5; ECF No.

30 Ex. 1 at 5. Plaintiff's testimony as to the effect of these medical conditions,

particularly round ligament syndrome, was that they "made [her] muscles feel like

2

they were being pulled in every direction. When [she]'d lift over [her] head or stretch or climb, it affected it more so." ECF No. 30 Ex. 1 at 5.

As Plaintiff testified about her physical condition at the time, "it made it so I couldn't climb. I couldn't lift above my head. I couldn't perform my job the way I wanted to perform it." ECF No. 33 at 7. Further, in a healthcare provider certification form dated March 6, 2012, Dr. Richard Lubell, Plaintiff's OB/GYN, indicated that although Plaintiff could perform certain types of work, she could not do her job. ECF No. 24 Ex. 2 at 63 (stating that Plaintiff "can't lift over head and no climbing"). Dr. Lubell wrote that Plaintiff "was first unable to work due to the serious health condition(s)" starting February 13, 2012 but could "return to work at his or her normal schedule" on March 13, 2012. Id.

Plaintiff testified that some products at Defendant's facility were lighter than others. ECF No. 33 at 33. However, when asked whether "there [was] any product that [she] could have picked at that time without lifting, bending, [or] climbing," Plaintiff responded, "No." Id. Plaintiff admitted that she "could not lift over her head and could not climb at that time." ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7.

Plaintiff's first accommodation request came after Dr. Lubell completed a form on her behalf on February 19, 2012, advising that she be placed on bedrest through February 20, 2012.[1] ECF No. 24 Ex. 2 at 41; ECF No. 24 at 6; ECF No. 30

---

[1] Dr. Lubell's handwriting is unclear as to whether bedrest is advised "from" or "thru" February 20, 2012. The Court believes that the most reasonable interpretation of the handwriting is

Ex. 1 at 6. Plaintiff gave that note to Defendant's Chemung Human Resources Department on February 20, 2012. ECF No 24 at 6; ECF No. 30 Ex. 1 at 6. Plaintiff was told that accommodation via transfer to another position was not possible because "picking"—the job to which she was currently assigned—"was light duty." ECF No. 33 at 33; ECF No. 30 Ex. 1 at 6. Plaintiff claims that the Human Resources Department went on to explain that because she was already employed in a light duty capacity, temporary leave was the only feasible accommodation, and she would need to go home and file for that leave or would likely face termination. ECF No. 24 at 6; ECF No. 30 Ex. 1 at 6. Defendant's Human Resources Department gave Plaintiff the number to call to request leave, which Plaintiff called later that day. ECF No. 24 at 6; ECF No. 30 Ex. 1 at 6.

As such, on February 20, 2012, Plaintiff requested her first leave of absence from Defendant's Leave of Absence Department for the period dating from February 10, 2012 through February 28, 2012. ECF No. 24 at 6; ECF No. 30 Ex. 1 at 6. On March 9, 2012, Defendant advised Plaintiff that it had not received adequate documentation supporting her leave. ECF No. 24 at 6; ECF No. 30 Ex. 1 at 6. Then, on March 13, 2012, Plaintiff's OB/GYN faxed a healthcare provider certification for leave form dated March 6, 2012. ECF No. 24 at 6; ECF No. 30 Ex. 1 at 6. Defendant thereafter approved Plaintiff's initial leave request as well as her

---

"thru," as reading it to say "from" would likely require provision of some end date, but no end date is indicated. ECF No. 24 Ex. 2 at 41; ECF No. 24 at 6; ECF No. 30 Ex. 1 at 6.

first request for an extension through April 16, 2012.[2] ECF No. 30 Ex. 1 at 7.

In response to an updated letter from Plaintiff's doctor, Defendant subsequently extended her leave period a second time, then to conclude on May 23, 2012. ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7. Defendant thereafter extended Plaintiff's leave to June 22, 2012. ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7. After that, Defendant again extended Plaintiff's leave, this time stretching it through August 2, 2012. ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7. After a bout with persistent back pain, Plaintiff requested another leave extension, which Defendant approved through August 12, 2012. ECF No. 24 at 8; ECF No. 30 Ex. 1 at 8. All told, Defendant extended Plaintiff's first leave period at least five times.

Plaintiff testified that she received short-term disability payments while on leave. ECF No. 33 at 13. Two of Plaintiff's 2012 W-2 forms confirm her receipt of short-term disability payments. Both forms indicate that they account for "third-party sick pay" allotted to Plaintiff in 2012. ECF No. 33 at 84–85. One of the forms accounts for "wages, tips, other comp." that totaled $684.96, ECF No. 33 at 84, while the second accounts for similar payments that totaled $2,318.80. ECF No. 33 at 85. Plaintiff testified that she received those payments during her first

---

[2] Though Defendant could not approve Plaintiff's leave under the Family and Medical Leave Act (FMLA) because Plaintiff had not at that time met the FMLA's 12-month length of service requirement, it was able to approve her leave to "run concurrently under applicable state leave provisions and/or company leave policies." ECF No. 24 Ex. 2 at 65; ECF No. 30 Ex. 1 at 7. The subject of that notification read: "Continuous Leave of Absence Approval—Maternity." ECF No. 24 Ex. 2 at 65.

leave in 2012 but not during her second leave, which the Court details next. ECF No. 33 at 13.

**C. Plaintiff's Second Leave**

Shortly after returning to work on August 13, 2012, Plaintiff began to suffer from postpartum depression. ECF No. 24 at 8; ECF No. 30 Ex. 1 at 8. On September 24, 2012, Plaintiff requested intermittent personal leave from Defendant's Leave of Absence Department but was advised that Defendant did not offer intermittent personal leave. ECF No. 24 at 9; ECF No. 30 Ex. 1 at 9. Accordingly, Defendant's Leave of Absence Department told Plaintiff that she could choose between medical leave or family bonding leave, and Plaintiff chose family bonding leave. ECF No. 24 at 9; ECF No. 30 Ex. 1 at 9. On September 25, 2012, Defendant approved a continuous leave of absence for baby bonding for Plaintiff from September 24, 2012 through September 30, 2012. ECF No. 24 at 9; ECF No. 30 Ex. 1 at 9. Subsequent extensions of Plaintiff's leave by Defendant are detailed in the numbered list as follows:

1.      On October 2, 2012, Defendant approved Plaintiff's request to extend her leave to October 2, 2012. ECF No. 24 at 9; ECF No. 30 Ex. 1 at 9.

2.      On October 3, 2012, Defendant approved a subsequent request by Plaintiff to extend her leave to October 7, 2012. ECF No. 24 at 9; ECF

No. 30 Ex. 1 at 9.

3.      On October 11, 2012, Defendant approved a subsequent request by

Plaintiff to extend her leave to October 14, 2012. ECF No. 24 at 9;

ECF No. 30 Ex. 1 at 9.

4.      On October 18, 2012, Defendant approved a subsequent request by

Plaintiff to extend her leave to October 21, 2012. ECF No. 24 at 10;

ECF No. 30 Ex. 1 at 9.

5.      On October 24, 2012, Defendant approved a subsequent request by

Plaintiff to extend her leave to October 24, 2012. ECF No. 24 at 10;

ECF No. 30 Ex. 1 at 9.

6.      On October 26, 2012, Defendant approved a subsequent request by

Plaintiff to extend her leave to October 29, 2012. ECF No. 24 at 10;

ECF No. 30 Ex. 1 at 9.

7.      On October 31, 2012, Defendant approved a subsequent request by

Plaintiff to extend her leave to October 31, 2012. ECF No. 24 at 10;

ECF No. 30 Ex. 1 at 10.

8.      On November 2, 2012, Defendant approved a subsequent request by

Plaintiff to extend her leave to November 4, 2012. ECF No. 24 at 10;

ECF No. 30 Ex. 1 at 10.

9.      On November 6, 2012, Defendant approved a subsequent request by

Plaintiff to extend her leave to November 6, 2012. ECF No. 24 at 10; ECF No. 30 Ex. 1 at 10.

10.     On November 8, 2012, Defendant approved a subsequent request by Plaintiff to extend her leave to November 7, 2012. ECF No. 24 at 11; ECF No. 30 Ex. 1 at 10.

11.     On November 10, 2012, Defendant approved a subsequent request by Plaintiff to extend her leave to November 12, 2012. ECF No. 24 at 11; ECF No. 30 Ex. 1 at 10.

12.     On November 12, 2012, Defendant approved a subsequent request by Plaintiff to extend her leave to November 13, 2012. ECF No. 24 at 11; ECF No. 30 Ex. 1 at 10.

13.     On November 16, 2012, Defendant approved a subsequent request by Plaintiff to extend her leave to November 18, 2012. ECF No. 24 at 11; ECF No. 30 Ex. 1 at 10.

14.     On November 19, 2012, Defendant approved a subsequent request by Plaintiff to extend her leave to November 25, 2012. ECF No. 24 at 11; ECF No. 30 Ex. 1 at 10.

On December 3, 2012 after granting Plaintiff fourteen leave extensions, Defendant sent a letter to Plaintiff indicating that it had received her request for a subsequent medical leave of absence from November 26, 2012 through December

9, 2012 and instructing her to submit to Defendant's Leave of Absence Department a completed healthcare provider certification form within fifteen calendar days of the receipt of the letter. ECF No. 24 at 12; ECF No. 30 Ex. 1 at 10–11.

On December 16, 2012, Plaintiff's nurse practitioner completed the first certification form associated with Plaintiff's second leave period. ECF No. 24 at 12; ECF No. 30 Ex. 1 at 11. Item three of the form asked, "Can the employee do work of any kind?" and provided four potential options from which to choose a response: (1) "Yes, the employee can do his or her job"; (2) "Yes, the employee can do part of his or her job"; (3) "Yes, the employee can work but cannot do his or her job"; and (4) "No, the employee cannot do any work." ECF No. 24 at 12; ECF No. 30 Ex. 1 at 11. Plaintiff's nurse practitioner checked the first box: "Yes, the employee can do his or her job." ECF No. 24 at 12; ECF No. 30 Ex. 1 at 11.

Item four of the first certification form asked whether the employee needed to miss work continuously, defined as "[a]n uninterrupted absence for a single illness or injury," or intermittently, defined as "[o]ccasional absences due to a single illness or injury (includes reduced schedule)." ECF No. 24 at 12–13; ECF No. 30 Ex. 1 at 11. Plaintiff's nurse practitioner checked the box in item four labeled "intermittently" and indicated that Plaintiff would be away from work for less than four hours at a time to attend follow-up appointments. ECF No. 24 at 13; ECF No. 30 Ex. 1 at 11. Instead of the December 9, 2012 date to which Plaintiff

had originally requested her leave to run, her nurse practitioner indicated that Plaintiff could not return to work at her normal schedule until December 31, 2012. ECF No. 24 at 13; ECF No. 30 Ex. 1 at 11. Further, Plaintiff admitted that she understood the difference between "continuously" and "intermittently" as defined in the first certification and otherwise understood that the leave she requested was continuous and not intermittent. ECF No. 24 at 13; ECF No. 30 Ex. 1 at 11.

As a result, on December 20, 2012, Defendant sent Plaintiff a letter indicating that it "recently received documentation regarding [her] leave request, however the documentation is incomplete." ECF No. 24 Ex. 3 at 56. Specifically, the letter indicated that the "[c]ertification form has conflicting information, the employee requested a continuous health leave with a start date of 11-26-12 and the return date was changed and needs to be verified by doctor." Id.[3]

On December 28, 2012, Plaintiff faxed a second healthcare provider certification form completed by her nurse practitioner to Defendant's Leave of Absence Department. ECF No. 24 at 14; ECF No. 30 Ex. 1 at 12. The second certification form was largely similar to the first, as Plaintiff's nurse practitioner again indicated that "[y]es, the employee can do his or her job" and that leave was

---

[3] Plaintiff contends that she did not receive this letter, despite receiving all of the other pertinent documents Defendant mailed to her at that address. ECF No. 30 Ex. 1 at 12. The Court reminds Plaintiff that "[t]he common law has long recognized a presumption that an item properly mailed was received by the addressee." In re Cendant Corp. Prides Litig., 311 F.3d 298, 304 (3d Cir. 2002) (Weis, J.) (citing Hagner v. United States, 285 U.S. 427, 430 (1932)).

needed only "intermittently." ECF No. 24 at 14–15; ECF No. 30 Ex. 1 at 12. The

second certification also reiterated that the estimated return date was December 31,

2012. ECF No. 24 at 15; ECF No. 30 Ex. 1 at 12.

On January 3, 2013, Defendant's Leave of Absence Department sent

Plaintiff a letter with the subject line "Incomplete Supporting Documentation,"

which Plaintiff admits to receiving. ECF No. 24 at 15; ECF No. 30 Ex. 1 at 12. The

letter again clarified that the documentation it had received to support Plaintiff's

leave contained conflicting information: "this employee is on a continuous health

leave from 11-26-12 and certification says she can work." ECF No. 24 at 15; ECF

No. 30 Ex. 1 at 13.The letter from Defendant stated that Plaintiff had to submit

another completed certification form within seven days, and if she failed to do so,

her leave request could be denied. ECF No. 24 at 16; ECF No. 30 Ex. 1 at 13.

Defendant's letter also instructed Plaintiff on whom to contact with any questions

regarding completion of the certificate. ECF No. 24 at 16; ECF No. 30 Ex. 1 at 13.

Upon receiving the letter, Plaintiff understood that there was a problem with the

documentation. ECF No. 30 Ex. 1 at 13.

Nevertheless, on January 9, 2013, Defendant approved Plaintiff's leave

through December 30, 2012. ECF No. 24 at 16; ECF No. 30 Ex. 1 at 13. At the

same time, it sent Plaintiff a letter in which it acknowledged that she had requested

to extend her leave to January 14, 2013 and requested that she submit a completed

healthcare provider certification form within fifteen days. ECF No. 24 at 16; ECF

No. 30 Ex. 1 at 13. On January 28, 2013, Defendant sent Plaintiff a follow-up letter

with the subject line "Supporting Documentation Not Received—First Reminder,"

which stated that Defendant's Leave of Absence Department had not received the

required documentation to support the requested leave extension and instructed her

to submit a proper certification form within seven days. ECF No. 24 at 16–17; ECF

No. 30 Ex. 1 at 13. The letter reminded Plaintiff that if she failed to do so, her

leave request could be denied, and it also instructed her on whom to contact with

any questions. ECF No. 24 at 17; ECF No. 30 Ex. 1 at 13.

In response to Defendant's January 9, 2013, letter, Plaintiff contacted her

doctor that same day but was unable to submit another certification because her

doctor was on vacation. ECF No. 24 at 17–18; ECF No. 30 Ex. 1 at 13–14; ECF

No. 33 at 24–25. On January 28, 2013, at the direction of Deborah ("Deb") W.

Montrose, Defendant's Human Resource Manager for the facility at which Plaintiff

worked, Defendant sent Plaintiff a letter indicating that her employment was

terminated. ECF No. 24 at 17; ECF No. 30 Ex. 1 at 14. Montrose testified that she

had only held the Human Resources Manager position for about five months at that

time, was still in a learning curve, and was not fully familiar with Defendant's

leave of absence processes and systems. ECF No. 24 at 17; ECF No. 30 Ex. 1 at

14. Montrose explained that when she directed the termination letter to be sent to

Plaintiff, she believed that Plaintiff's leave had ended and that Plaintiff had simply failed to return to work or respond to the documentation requests. ECF No. 24 at 18; ECF No. 30 Ex. 1 at 14. Montrose also testified that she was unaware of Plaintiff's pending leave extension request. ECF No. 24 at 18; ECF No. 30 Ex. 1 at 14. Montrose submitted a sworn affidavit in which she stated that:

> On or around January 28, 2013, I instructed Human Resources Specialist Becky Gaffney to send a termination letter to Nicole Moore. At that time, I had not reviewed any medical documentation concerning Ms. Moore. I had no information about her medical condition and I did not know she was disabled. I based my decision to send the letter solely on (1) emails that I had received from the leave of absence department stating that Ms. Moore's leave had expired; and (2) my own knowledge that Ms. Moore had not returned to work.

ECF No. 39 at 49.

Contrary to the explanation given by Montrose, Plaintiff alleges that the termination letter was evidence "that 'internally' a breaking point was reached," which resulted in Plaintiff's firing as a result of her disability. ECF No. 30 at 12. Moreover, Plaintiff contends that whether Montrose had a "reasonable and honestly held belief" that Plaintiff had exhausted her leave without providing sufficient authorization is "a dispute of material fact." Id. Plaintiff suggests that "[a] reasonable jury could determine that Montrose was motivated by a discriminatory animus" because "Montrose knew about Plaintiff's pregnancy when she ordered the termination" and because "Montrose never reached out to the Plaintiff to inform her that the termination was a 'mistake.'" Id. at 12–13.

Montrose stated in her deposition that she did not call Plaintiff because she knew communication "was occurring between [Plaintiff] and the leave of absence department," and that such communication "regard[ed] documentation that was required for [Plaintiff's] leave to be extended." ECF No. 33 Ex. 2 at 5.

It is undisputed that Plaintiff called Defendant's Leave of Absence Department on the day that she received the termination letter. ECF No. 24 at 18; ECF No. 30 Ex. 1 at 14. It is also undisputed that Plaintiff asked whether she should still submit the documentation supporting her leave even though she had received the letter and that Defendant's Leave of Absence Department told her to still submit the documentation. ECF No. 24 at 18; ECF No. 30 Ex. 1 at 15. On that same call, Plaintiff also asked the Leave of Absence Department to extend her leave through February 4, 2013 because her doctor was on vacation and had lost the paperwork. ECF No. 24 at 18; ECF No. 30 Ex. 1 at 15.

On February 5, 2013, Defendant's Leave of Absence Department sent Plaintiff a letter with the subject line "Supporting Documentation Not Received—Second Reminder." ECF No. 24 at 19; ECF No. 30 Ex. 1 at 15. Plaintiff does not dispute that she received this letter. ECF No. 24 at 19; ECF No. 30 Ex. 1 at 15. The letter, like its numerous predecessors, provided contact information should Plaintiff have any questions and specifically stated that Plaintiff's "leave request may be denied and may result in separation of [her]

employment benefits" should she fail to supply the requested information within

seven days.  ECF No. 24 at 19; ECF No. 30 Ex. 1 at 15.

In response to that letter, Plaintiff contacted her nurse practitioner to check

on the status of her healthcare provider certification form. ECF No. 24 at 19; ECF

No. 30 Ex. 1 at 15. On February 8, 2013, Plaintiff's nurse practitioner submitted a

third certification to Defendant. ECF No. 24 at 19; ECF No. 30 Ex. 1 at 15. Again,

she indicated that "[y]es, the employee can do his or her job." ECF No. 24 at 19;

ECF No. 30 Ex. 1 at 15. This time, the nurse practitioner did not check either the

"continuously" or the "intermittently" box. ECF No. 24 at 20; ECF No. 30 Ex. 1 at

15. Instead, she checked a box that read "unplanned, unknown, or intermittently"

and wrote that Plaintiff would need to be away from work three to four times a

year for doctor's appointments. ECF No. 24 at 20; ECF No. 30 Ex. 1 at 15.

Plaintiff's nurse practitioner indicated that Plaintiff could return to work at her

normal schedule by February 11, 2013. ECF No. 24 at 20; ECF No. 30 Ex. 1 at 15.

Plaintiff further admitted that she understood that the leave she was officially

requesting was a continuous leave, not an intermittent one. ECF No. 24 at 20; ECF

No. 30 Ex. 1 at 15.

On February 13, 2013, Defendant sent Plaintiff a letter with the subject line

"Incomplete Supporting Documentation," which Plaintiff admits to receiving. ECF

No. 24 at 20; ECF No. 30 Ex. 1 at 15. The letter stated that the documentation

Plaintiff had recently submitted to Defendant's Leave of Absence Department to support her leave extension was incomplete. ECF No. 24 at 21; ECF No. 30 Ex. 1 at 15. Specifically, the letter stated that the third "certification form has provided conflicting information; it does not support your continuous leave extension request." ECF No. 24 at 21; ECF No. 30 Ex. 1 at 16. It also stated that if Plaintiff did not provide the requested information within seven days, her "leave request may be denied and may result in separation of [her] employment and benefits." ECF No. 24 at 21; ECF No. 30 Ex. 1 at 16. The letter again instructed Plaintiff on whom to contact with any questions regarding the healthcare provider certification form. ECF No. 24 at 21; ECF No. 30 Ex. 1 at 16. Plaintiff admits that after receiving the letter, she showed it to her nurse practitioner. ECF No. 24 at 21; ECF No. 30 Ex. 1 at 16.

Again, on February 20, 2013, Defendant's Leave of Absence Department sent Plaintiff a letter with the subject line "Incomplete Supporting Documentation," which Plaintiff admits to receiving. ECF No. 24 at 21; ECF No. 30 Ex. 1 at 16. It stated that the documentation Plaintiff had recently submitted to support her requested leave extension was incomplete. ECF No. 24 at 21; ECF No. 30 Ex. 1 at 16. Specifically, it stated that the third "certification form has provided conflicting information; it does not support your continuous leave extension request." ECF No. 24 at 22; ECF No. 30 Ex. 1 at 16. Once again, it warned

Plaintiff that failure to provide the requested information may result in her leave request being denied. ECF No. 24 at 22; ECF No. 30 Ex. 1 at 16. The letter also provided contact information should she have any questions regarding completion of the form. ECF No. 24 at 22; ECF No. 30 Ex. 1 at 16.[4]

In response, Plaintiff's nurse practitioner submitted the fourth and final certification form on February 22, 2013. ECF No. 24 at 22; ECF No. 30 Ex. 1 at 16. The only difference between the third and fourth certification forms was that on the fourth certification form, Plaintiff's nurse practitioner checked the box for "Intermittent[ ]" leave. ECF No. 24 at 22; ECF No. 30 Ex. 1 at 16. Defendant's Undisputed Statement of Fact #180 states: "Moore did not compare the Fourth Certification to the First, Second or Third Certification, and did not take any action to determine whether the deficiencies in the prior certifications had been correct. Moore Dep., pp. 95-97 . . . ." ECF No. 24 at 22. Plaintiff responds as follows: "Denied as stated. While it is admitted Plaintiff so testified, there is a dispute of material fact as to whether Defendant engaged in the interactive process in good-faith." ECF No. 30 Ex. 1 at 17. Plaintiff's own deposition testimony reads as follows:

---

[4] The Court notes that portions of these undisputed facts were difficult to reconcile with certain of the allegations made in Plaintiff's Complaint. See, e.g., ECF No. 1 at 7 ("33. Plaintiff never received any document, while she was on medical leave, indicating that her disability leave was in some way in violation of Defendant's policy or that her job would be in jeopardy if she failed to return to work before obtaining clearance from her doctor." ). The Court reminds Plaintiff that Fed. R. Civ. P. 11(b) mandates that an attorney conduct "an inquiry reasonable under the circumstances" into the law and facts prior to certification and filing in Federal Court.

Q:    Did you compare it [the fourth certification form] to the prior
      forms?

A:    No.

Q:    Did you take any action to determine whether the deficiencies
      in the prior forms had been corrected?

A:    No.

ECF No. 33 at 26. The Court finds that Defendant's Undisputed Statement of Fact

#180 is clearly supported as stated by Plaintiff's own testimony.

On February 25, 2013, Plaintiff called Defendant's Leave of Absence

Department. ECF No. 24 at 24; ECF No. 30 Ex. 1 at 17. On that call, Plaintiff was

told that her leave was only approved through December 30, 2012, and that she

was seeking continuous leave despite the fact that her documentation stated that

she only required intermittent leave. ECF No. 24 at 24; ECF No. 30 Ex. 1 at 17.

Also on that call, Plaintiff told Defendant's Leave of Absence Department that she

had talked to her nurse practitioner because she should be on continuous leave, but

the nurse practitioner had checked the box on the certifications for intermittent

leave. ECF No. 24 at 24; ECF No. 30 Ex. 1 at 17.

Plaintiff testified that she understood that her nurse practitioner checking the

box for intermittent leave while she simultaneously sought continuous leave was

one of the reasons for Defendant's concern with Plaintiff's four certification forms.

ECF No. 24 at 24; ECF No. 30 Ex. 1 at 17. On February 25, 2013, Defendant's

Leave of Absence Department even called the office of Plaintiff's nurse

practitioner to discuss the conflicting information in the fourth certification form.

ECF No. 24 at 24; ECF No. 30 Ex. 1 at 17. However, the nurse practitioner's office

refused to provide any information to Defendant. ECF No. 24 at 24; ECF No. 30

Ex. 1 at 17.

Plaintiff again spoke with Defendant's Leave of Absence Department on

February 28, 2013. ECF No. 24 at 24; ECF No. 30 Ex. 1 at 17. She again asked

whether she should submit the certification form even though she had previously

received a termination letter from Defendant, and the Department again told her

that she should submit the certification. ECF No. 24 at 24; ECF No. 30 Ex. 1 at 17.

On March 6, 2013, Defendant's Leave of Absence Department left a message for

Plaintiff, which Plaintiff received.  ECF No. 24 at 25; ECF No. 30 Ex. 1 at 18. The

message stated that Defendant had not received any updated paperwork to support

Plaintiff's extension. ECF No. 33 at 27. In that message, Defendant's Leave of

Absence Department also informed Plaintiff that it had sent an e-mail to

Defendant's Human Resources Department to stop her termination pending further

notice from the Leave Department. Id.

On March 11, 2013, Defendant sent Plaintiff a letter with the subject line

"Leave Extension Request Denied," which Plaintiff received. ECF No. 24 at 25;

ECF No. 30 Ex. 1 at 18. The Letter stated that Plaintiff's request to extend her

leave to January 14, 2013 was not approved because the "certification provided was insufficient and/or incomplete even after [she] was given an opportunity to resubmit a completed form." ECF No. 24 at 25; ECF No. 30 Ex. 1 at 18. The letter further stated that any absences related to leave extensions were unauthorized, ECF No. 24 at 25; ECF No. 30 Ex. 1 at 18, thereby effectively terminating her employment. ECF No. 24 at 26; ECF No. 30 Ex. 1 at 19. Plaintiff acknowledges that she was given multiple opportunities to submit the necessary documentation, but notes that she ultimately did not supply it because she relied on her medical providers to do so. ECF No. 24 at 25; ECF No. 30 Ex. 1 at 18.

On July 10, 2014, Plaintiff filed her Complaint with this Court. ECF No. 1. She alleged three ADA claims: (1) failure to accommodate; (2) disparate treatment (discriminatory termination); and (3) retaliation. ECF No. 1 at 5–9. Defendant filed its Motion for Summary Judgment on April 27, 2015. ECF No. 20. In her response brief to Defendant's Motion, Plaintiff noted that she had "elected to withdraw her claim for retaliation in this case." ECF No. 30 at 2 n.1. Plaintiff's retaliation claim is therefore dismissed with prejudice. Further, because there are no genuine disputes of material fact precluding summary judgment, Defendant's Motion for Summary Judgment is granted in full as to all of Plaintiff's remaining claims.

**II. LAW**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts that could alter the outcome are 'material facts,' see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)." Clark v. Modern Grp. Ltd., 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.). "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case." Id. "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law." Id. "Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment." Lexington Ins. Co. v. W. Pennsylvania Hosp., 423 F.3d 318, 333 (3d Cir. 2005) (Becker, C.J.). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." Celotex Corp., 477 U.S. at 323–24.

"[T]he inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of

proof that would apply at the trial on the merits." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 252. Thus, "[i]f the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." <u>Id.</u> "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Id.</u> "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'" <u>Id.</u> (quoting <u>Schuylkill & Dauphin Imp. Co. v. Munson</u>, 81 U.S. 442, 447 (1871)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp.</u>, 477 U.S. at 323 (internal quotations omitted). "[R]egardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that

the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id.

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, Inc., 477 U.S. at 250. "Such affirmative evidence—regardless of whether it is direct or circumstantial—must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance. Whether the quantum of circumstantial evidence in any particular case is enough to meet the Liberty Lobby standard sometimes requires us to make difficult, fact-specific, perhaps somewhat arbitrary judgments." Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 460–61 (3d Cir. 1989) (Becker, C.J.). For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed" must be supported by: (i) "citing to particular parts of materials in the record" that go beyond "mere allegations"; (ii) "showing that the materials cited do not establish the absence or presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Consequently, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which

would contradict the facts identified by the movant.'" <u>Port Auth. of N.Y. and N.J.</u>

<u>v. Affiliated FM Ins. Co.</u>, 311 F.3d 226, 233 (3d Cir.2003) (Weis, J.). Moreover,

"[i]f a party fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact as required by Rule 56(c), the court may . . .

consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

On motion for summary judgment, "[t]he court need consider only the cited

materials, but it may consider other materials in the record." Fed. R. Civ. P.

56(c)(3).

"[A]t the summary judgment stage the judge's function is not himself to

weigh the evidence and determine the truth of the matter but to determine whether

there is a genuine issue for trial." <u>Liberty Lobby, Inc.</u>, 477 U.S. at 249. "[T]here is

no issue for trial unless there is sufficient evidence favoring the nonmoving party

for a jury to return a verdict for that party." <u>Id.</u> "If the evidence is merely colorable

. . . or is not significantly probative, summary judgment may be granted." <u>Id.</u> at

249–50 (internal citations omitted).

As the United States Court of Appeals for the Third Circuit has explicitly

instructed district courts who are disposing of a summary judgment motion in the

employment discrimination setting:

> [T]o defeat summary judgment when the defendant answers the
> plaintiff's <u>prima facie</u> case with legitimate, non-discriminatory
> reasons for its action, the plaintiff must point to some evidence, direct
> or circumstantial, from which a factfinder could reasonably either

(1) disbelieve the employer's articulated legitimate reasons; or
(2) believe that an invidious discriminatory reason was more likely
than not a motivating or determinative cause of the employer's action.
In other words, . . . a plaintiff who has made out a prima facie case
may defeat a motion for summary judgment by either (i) discrediting
the proffered reasons, either circumstantially or directly, or
(ii) adducing evidence, whether circumstantial or direct, that
discrimination was more likely than not a motivating or determinative
cause of the adverse employment action.

[T]o avoid summary judgment, the plaintiff's evidence rebutting the
employer's proffered legitimate reasons must allow a factfinder
reasonably to infer that each of the employer's proffered non-
discriminatory reasons was either a post hoc fabrication or otherwise
did not actually motivate the employment action (that is, the proffered
reason is a pretext).

To discredit the employer's proffered reason, however, the plaintiff
cannot simply show that the employer's decision was wrong or
mistaken, since the factual dispute at issue is whether discriminatory
animus motivated the employer, not whether the employer is wise,
shrewd, prudent, or competent. Rather, the non-moving plaintiff must
demonstrate such weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's proffered legitimate
reasons for its action that a reasonable factfinder could rationally find
them unworthy of credence, and hence infer that the employer did not
act for the asserted non-discriminatory reasons. While this standard
places a difficult burden on the plaintiff, it arises from an inherent
tension between the goal of all discrimination law and our society's
commitment to free decisionmaking by the private sector in economic
affairs.

Fuentes v. Perskie, 32 F.3d 759, 764–65 (3d Cir. 1994) (Becker, C.J.) (internal

citations and quotations omitted) (emphasis in original).

## III. ANALYSIS

**A. Defendant's Motions for Summary Judgment is granted as to Plaintiff's failure to accommodate claim.**

The ADA's protections extend to all "qualified individuals" with disabilities. 42 U.S.C. § 12112(a). By definition, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA's reasonable accommodations mandate is located at 42 U.S.C. § 12112(5)(A). That provision clarifies that a covered entity's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee" is a form of discrimination, "unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." Id.[5]

"An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: '1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably

---

[5] There is no dispute in this case that CVS Rx Services, Inc. satisfies the statutory definition of a "covered entity." 42 U.S.C. § 12111(2).

accommodated but for the employer's lack of good faith.'" <u>Williams v. Philadelphia Hous. Auth. Police Dep't</u>, 380 F.3d 751, 772 (3d Cir. 2004) (quoting <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 319–20 (3d Cir. 1999)).

The ADA enumerates certain examples of "reasonable accommodations." These examples include: "making existing facilities used by employees readily accessible to and usable by individuals with disabilities," as well as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(A)–(B). As relevant to this case, the regulations interpreting the ADA provide that "an employee with an impairment that previously limited, but no longer substantially limits, a major life activity may need leave or a schedule change to permit him or her to attend follow-up or 'monitoring' appointments with a health care provider." 29 C.F.R. § 1630.2(k)(3).

In regard to "reassignment to a vacant position," those same regulations state that "[i]n general, reassignment should be considered only when accommodation within the individual's current position would pose an undue hardship" and that the desired reassignment position must be open at the time of the request or "within a

reasonable amount of time" after the request. 29 C.F.R. § 1630, App. § 1630.2(o).

Neither is an employer required "to maintain the reassigned individual with a

disability at the salary of the higher graded position" or "to promote an individual

with a disability as an accommodation." <u>Id.</u>

In sum, "reassignment is an accommodation of last resort." <u>Cravens v. Blue

Cross & Blue Shield of Kansas City</u>, 214 F.3d 1011, 1019 (8th Cir. 2000)

("Congress saw reassignment, as the EEOC does, as an option to be considered

only after other efforts at accommodation have failed."). "Moreover, the disabled

employee must be seeking an existing position within the company; the employer

is not required to create a new position as an accommodation." <u>Id.</u> <u>See also</u> <u>Shiring

v. Runyon</u>, 90 F.3d 827, 831 (3d Cir. 1996) ("It follows that the district court did

not err in refusing to consider the non-existent position . . . as an accommodation

that would make [plaintiff] qualified.").

Further, the employer and its employee must maintain open and effective

lines of communication, a requirement that has come to be known as engaging in

the "interactive process":

> To determine the appropriate reasonable accommodation it may be
> necessary for the covered entity to initiate an informal, interactive
> process with the individual with a disability in need of the
> accommodation. This process should identify the precise limitations
> resulting from the disability and potential reasonable accommodations
> that could overcome those limitations.

29 C.F.R. 1630.2(o)(3). <u>See also</u> <u>Mengine v. Runyon</u>, 114 F.3d 415, 416 (3d Cir.

1997) (Scirica, J.) ("[W]e believe 'reasonable accommodation' includes the employer's reasonable efforts to assist the employee and to communicate with the employee in good faith.").

The United States Court of Appeals for the Third Circuit has set forth express instructions for district courts considering ADA accommodation claims in Mengine v. Runyon, 114 F.3d 415 (3d Cir.1997) (Scirica, J.). See, e.g., Deane v. Pocono Med. Ctr., 142 F.3d 138, 149 (3d Cir. 1998) (Becker, C.J.) ("[W]e take this opportunity to observe that this protracted (and very much ongoing) litigation would likely have been unnecessary had the parties taken seriously the precepts announced in our opinion in Mengine v. Runyon, 114 F.3d 415 (3d Cir.1997)."). [6] In Mengine, the Third Circuit explained:

> An employer is not required to create a job for a disabled employee. But a federal employer has a duty to reassign nonprobationary employees if they become unable to perform the essential functions of their jobs, unless the reassignment would cause the employer undue hardship. In bringing suit, it is [the employee's] burden to make at least a facial showing that such accommodation [reassignment] is possible. Specifically, [the employee] must "demonstrate that there were vacant, funded positions whose essential duties he was capable of performing, with or without reasonable accommodation, and that these positions were at an equivalent level or position as [his former job]."

Mengine, 114 F.3d at 418 (internal citations and quotations omitted) (emphasis added).

---

[6] Although Mengine and certain authorities relied upon in this Memorandum reached the "reasonable accommodation" issue in the context of the Rehabilitation Act of 1973, 29 U.S.C. § 701, the Third Circuit has clarified that "[a]s we noted in Mengine, interpretations of the Rehabilitation Act's 'reasonable accommodation' provisions are relevant to our analysis of the ADA and vice versa because in 1992, Congress amended the section of the Rehabilitation Act defining 'reasonable accommodation' to incorporate the standards of the ADA. See 114 F.3d at 420 & n. 4 (citing 29 U.S.C. § 794(d))." Deane, 142 F.3d at 149 n.13.

The Third Circuit has further emphasized that "[t]he interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 317 (3d Cir. 1999) (Cowen, J.). "All the interactive process requires is that employers make a good-faith effort to seek accommodations." Id.[7]

It is important to recognize that "an employee cannot make [the] employer provide a specific accommodation if another reasonable accommodation is instead provided." Solomon v. Sch. Dist. of Philadelphia, 532 F. App'x 154, 158 (3d Cir. 2013) (quoting Hankins v. The Gap, Inc., 84 F.3d 797, 800–01 (6th Cir.1996)). Moreover, "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." 29 C.F.R. § 1630, App. § 1630.9(a). As such, "a plaintiff asserting such a failure to accommodate claim must show, inter alia, that her employer refused to provide her with a proposed reasonable accommodation." Solomon v. Sch. Dist. of

---

[7] "Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." Taylor, 184 F.3d at 317.

Philadelphia, 882 F. Supp. 2d 766, 779–80 (E.D. Pa. 2012). "'[A]n employer cannot be faulted if' the employee's actions or omissions during the interactive process cause the process's failure." Colwell v. Rite Aid Corp., 602 F.3d 495, 507 (3d Cir. 2010) (quoting Taylor, 184 F.3d at 317).

In the matter before the Court, Plaintiff contends that Defendant's decision to offer her short-term disability leave rather than modify the climbing, lifting, and related tasks for which she was responsible during and after her pregnancy violated the ADA. ECF No. 1 at 5–6. Relatedly, Plaintiff has suggested that her decision to take short-term disability leave was a product of Defendant's failure to adequately engage in the interactive process. ECF No. 30 at 2, 14–17. Specifically, Plaintiff contends that she requested a transfer to another position during her pregnancy, but was told that could not be done because "picking was light duty." ECF No. 30 at 15. According to Plaintiff, Defendant had previously accommodated another employee with a transfer due to pregnancy, and Plaintiff was told by her supervisors that if she did not take a leave of absence, she would be fired. Id. at 15–16. Further, she suggests that after her pregnancy and during her bout of postpartum depression, she could have been sufficiently accommodated "if the Defendant secluded her where she could avoid 'run-ins' with other people." Id. at 16. Moreover, Plaintiff argues that "Defendant completely failed to engage in the interactive process by continually telling Plaintiff that her medical documentation

. . . was 'conflicting.'" ECF No. 30 at 17. The Court will address each of these claims in turn.

Plaintiff's first contention is that Defendant failed to accommodate her by denying her initial transfer request when she first became afflicted with pregnancy-related complications. However, Defendant is correct that Plaintiff was incapable of fully performing the essential functions of the picker job and therefore was not a "qualified individual" during that portion of her pregnancy. As she testified, "it made it so I couldn't climb. I couldn't lift above my head. I couldn't perform my job the way I wanted to perform it." Id. Further, Plaintiff's OB/GYN indicated that although Plaintiff could perform certain types of work, she could not do her job. ECF No. 24 Ex. 2 at 63 (stating that Plaintiff "can't lift over head and no climbing"). Moreover, when asked whether "there [was] any product that [she] could have picked at that time without lifting, bending, [or] climbing," Plaintiff responded, "No." Id. Plaintiff admitted that "[she] in fact could not lift over her head and could not climb at that time." ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7.

In response, Plaintiff makes much of the allegation that certain of Defendant's human resources employees told her that she would be permitted to take leave until her conditions subsided or would face termination. At the same time, however, Plaintiff acknowledges that this choice was necessary and logical because "picking"—the job to which she was assigned—already "was light duty."

ECF No. 33 at 33. That is to say, because Plaintiff was physically incapable of performing the essential functions of her job and because Plaintiff was already employed in a light duty capacity, Defendant saw a period of temporary leave as the only permissible accommodation in Plaintiff's case.

It is the view of this Court that most individuals seeking accommodation under the ADA would be quite contented in the event that their employer afforded them leave. In fact, to protect employers, courts have placed limits on the extent to which a leave request may even be considered a reasonable accommodation under the ADA. Byrne v. Avon Products, Inc., 328 F.3d 379, 381 (7th Cir. 2003) (Easterbrook, J.) ("Not working is not a means to perform the job's essential functions."); Reifer v. Colonial Intermediate Unit 20, 462 F. Supp. 2d 621, 633 (M.D. Pa. 2006) (Mannion, Mag. J.) ("An extended leave of absence may also be a reasonable accommodation under certain circumstances, but not if it is open-ended and indefinite."); Brangman v. AstraZeneca, LP, 952 F. Supp. 2d 710, 723 (E.D. Pa. 2013) (Brody, J.) ("The ADA does not require employers to grant indefinite or open ended disability leave . . . . Federal courts have permitted a leave of absence as a reasonable accommodation under the ADA because applying the reasonable accommodation at that time would enable the employee to perform her essential job functions in the near future."). Walton v. Mental Health Ass'n. of Se. Pennsylvania, 168 F.3d 661, 671 (3d Cir. 1999) (explaining that "a blanket

requirement that an employer allow such leave is beyond the scope of the ADA when the absent employee simply will not be performing the essential functions of her position" and so an employer's "decision to discontinue the accommodation does not give [Plaintiff] a cause of action").

What's more, not only did Defendant permit Plaintiff to take a leave of absence as she recovered from her pregnancy-related complications, but Plaintiff was paid during her leave period, and Defendant was willing to and did in fact extend the leave period ad infinitum so long as Plaintiff could provide the requisite documentation. Specifically, Plaintiff's 2012 W-2's showed that she received short-term disability payments in the amounts of $684.96, ECF No. 33 at 84, and $2,318.80, ECF No. 33 at 85, while on leave.

In addition, Defendant acquiesced in numerous extensions of Plaintiff's leave, again going beyond what federal courts have interpreted the ADA as requiring. After approving Plaintiff's initial leave request and first extension, ECF No. 30 Ex. 1 at 7, Defendant extended her leave period a second time. ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7. Defendant thereafter extended Plaintiff's leave to June 22, 2012. ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7. After that, Defendant again extended Plaintiff's leave, this time stretching through August 2, 2012. ECF No. 24 at 7; ECF No. 30 Ex. 1 at 7. Again, Plaintiff requested a leave extension, which Defendant approved through August 12, 2012. ECF No. 24 at 8; ECF No. 30 Ex. 1

at 8. Defendant thus extended Plaintiff's first leave period at least five times.

Consequently, because there is no genuine issue of material fact that Defendant responded to Plaintiff's requests in a more-than-satisfactory manner, Plaintiff's reasonable accommodation claim hinges largely upon whether Defendant was required to transfer her or create a new position where she could remain until her pregnancy complications and postpartum depression subsided. The answer in this case is that Defendant clearly did not have such an obligation. Plaintiff raises two separate theories: first, relying on hearsay, that at some point in time, Defendant transferred another pregnant picker to a different job and second, that during her postpartum depression, Defendant should have created a new role for Plaintiff that "secluded her where she could avoid 'run-ins' with other people." ECF No. 30 at 16.

First, the Court agrees with Defendant that the vague characterizations of potential accommodations put forth by Plaintiff in her deposition and briefing are akin to "some nebulous, unidentified workplace policy or duty that would have allowed her to work." ECF No. 39 at 21–22. Plaintiff's suggestions, which might more appropriately be termed "theorized" accommodations, lack the clarity, feasibility, and reasonableness that this Circuit has demanded by placing the initial burden in accommodation cases on the employee—a burden that requires the worker "to make at least a facial showing that such accommodation [reassignment]

is possible," <u>Mengine</u>, 114 F.3d at 418, and "to show[ ] that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions." <u>Taylor</u>, 184 F.3d at 317.

In her deposition testimony, Plaintiff could name only one other employee who was potentially transferred due to pregnancy, and the details Plaintiff provided with regard to that employee were based on hearsay and indistinct at best. According to Plaintiff's testimony, "there was another pregnant girl and they accommodated her and moved her to a different department that never had a job posting." ECF No. 33 at 32. When asked, Plaintiff recalled that her name was "Michelle Filer." <u>Id.</u> at 33. According to Plaintiff, Ms. Filer "was bragging about" being transferred due to her pregnancy. <u>Id.</u> Defense Counsel then pressed Plaintiff in the following exchange, demonstrating her lack of concrete knowledge about the details of this alleged accommodation and seriously calling into to question its relevance in the first place:

Q:   And did you ask them [Defendant's Human Resources personnel]  about Michelle being transferred?

A:   No.

Q:   Do you know what work Michelle did in receiving?

A:   No.

Q:   Do you know if Michelle had any disability?

A:   Other than she was pregnant? No.

Q:      Do you know what her responsibilities were in receiving?

A:      No.

 Id. In response, Defendant has offered the sworn affidavit of its Human

Resources Manager, Deb Montrose, which states in pertinent part:

> It is my understanding that Ms. Moore asserts that CVS
> accommodated another pregnant Distribution Center employee,
> Michelle Filer, by transferring her from a stocker position to
> accommodate pregnancy restrictions. However, based on the
> information in Ms. Filer's personnel file, Ms. Filer was able to
> perform her stocker position without any accommodation and CVS
> did  not transfer her as an accommodation.

ECF No. 39 at 50.

Even given this clear refutation by Defendant and the scant details offered

by Plaintiff, the Court notes a rather obscure feature of Plaintiff's argument. In a

recent seminal decision interpreting the Pregnancy Discrimination Act (PDA),

Young v. United Parcel Serv., Inc., 135 S. Ct. 1338 (2015), the Supreme Court of

the United States had occasion to discuss certain factual circumstances that might

give rise to an adverse inference of unlawful pregnancy discrimination under the

familiar McDonnell Douglas burden-shifting framework. Though the Court in

Young was analyzing a particular provision of the PDA, 42 U.S.C. § 2000e(k), its

application of the McDonnell Douglas framework is nonetheless instructive here.

The Court explained that a "plaintiff can create a genuine issue of material fact as

to whether a significant burden exists by providing evidence that the employer

accommodates a large percentage of nonpregnant workers while failing to accommodate a large percentage of pregnant workers." <u>Young</u>, 135 S. Ct. at 1354.

Confusingly, however, the logic behind Plaintiff's proposed comparison in this case runs counter to that illustrated by the Court in <u>Young</u>. Though a trier of fact may be able to lodge an adverse inference based upon the facts in <u>Young</u>: accommodation of nonpregnant employees coupled with the failure to accommodate similarly situated pregnant employees, it is unclear to this Court how the facts in this case: an alleged accommodation of one pregnant employee coupled with an alleged failure to accommodate <u>another</u> pregnant employee, give rise to an inference of discrimination "on the basis of" or "because of" pregnancy at all. The logical inference, the Court surmises, is that there were certain distinguishing characteristics between the two employees at issue—other than their pregnancies—that warranted termination of Plaintiff but not of her proposed comparator. That differentiating factor is very likely Plaintiff's own failure to adequately participate in the interactive process, a misstep to which the Court turns momentarily.[8]

Moreover, not only has Plaintiff failed to raise a triable issue as to any

---

[8]

For the sake of completeness, Plaintiff in her deposition named one other employee whom she believed to have been terminated because of pregnancy. Her name was Sue Tolan. According to Montrose's affidavit: "I have reviewed the personnel file of Susan Tolan. That file reflects that CVS terminated her employment for poor performance on May 2, 2012, after giving her multiple counselings, coaching, and opportunities to improve over a four month period." ECF No. 39 at 49–50.

specific details concerning this alleged prior accommodation of Ms. Filer, but also

at no time did she adduce any evidence suggesting that light-duty positions other

than picking even existed at Defendant's Chemung facility and were vacant during

the relevant time period. See Mengine, 114 F.3d at 418. Her evidentiary

submissions therefore do not adequately create a genuine issue of material fact as

to her initial reasonable accommodation claim.

The same can even more forcefully be said of Plaintiff's second reasonable

claim: that Defendant should have created a new position for her and "secluded her

where she could avoid 'run-ins' with other people" during her bout of postpartum

depression. ECF No. 30 at 16. Certainly that request goes well beyond the type of

"reasonable" accommodation the ADA and cases interpreting it envision. See Gaul

v. Lucent Technologies, Inc., 134 F.3d 576, 581 (3d Cir. 1998) (Cowen, J.)

(holding that it was "wholly impractical" to require an employer "to transfer [an

employee] to another department whenever he becomes 'stressed out' by a

coworker or supervisor" because "[i]t is difficult to imagine a more amorphous

'standard' to impose on an employer"); Schwarzkopf v. Brunswick Corp., 833 F.

Supp. 2d 1106, 1123 (D. Minn. 2011) ("[A]sking for a transfer to avoid certain co-

workers is not a request for a reasonable accommodation.").

Not only did Plaintiff fail entirely to make her required threshold showing as

to the existence of a vacancy or the operational feasibility of such an extreme

accommodation, but she even admitted during her deposition that her depression impacted her ability to complete her picker job in the first place. ECF No 33 at 31 ("It just kind of like fogs your mind and puts you in a bubble where you don't want to do nothing. . . . It affected relationships of how I would deal with people. . . . My moods wouldn't have been helpful if I went into an up or a down with coworkers. The bubble that I felt like I was in and then the fog, it just wouldn't have been a good mixture."). Although Plaintiff testified that she "would have tried to still do [her] job," she also admitted that her depression negatively impacted her ability to think clearly. Id.

That is enough to convince this Court that not only was Plaintiff's sequestration request highly unreasonable, it was also not a feasible way to permit her continued employment with Defendant. In their quest for an adequate ADA accommodation, employees should not forget that the entire purpose of such an accommodation is to permit them to continue working in their prior roles with certain adaptions. The purpose of the ADA is inherently adaptive. It is not meant to be wielded like a sword, a kind of affirmative action mechanism that forces employers to hold open vacancies for unreasonable periods of time or create new positions altogether.

Perhaps what Plaintiff's reasonable accommodation claim reduces to then is, as Defendant suggests, that "[Defendant] did not give her the specific

accommodation she wanted." ECF No. 23 Ex. 3 at 16. Such a justification is, of

course, not actionable in an ADA claim. <u>See</u> <u>Solomon</u>, 532 F. App'x at 158

(quoting <u>Hankins</u>, 84 F.3d at 800–01 ("[A]n employee cannot make [the] employer

provide a specific accommodation if another reasonable accommodation is instead

provided.")). <u>See also</u> 29 C.F.R. § 1630, App. § 1630.9(a) ("[T]he employer

providing the accommodation has the ultimate discretion to choose between

effective accommodations, and may choose the less expensive accommodation or

the accommodation that is easier for it to provide."). Federal courts have

demonstrated a measured temperance when opining upon an employer's selection

of a particular accommodation, recognizing full well that it is not the judiciary's

place to substitute its own judgment for that of a business manager whose day-to-

day closeness with his firm's operations commands a certain deference.

   On that issue, Defendant points to a recent and particularly applicable Third

Circuit decision, <u>Solomon v. Sch. Dist. of Philadelphia, 532 F. App'x 154 (3d Cir.</u>

<u>2013)</u> (Rosenthal, J.).[9] In <u>Solomon</u>, the Third Circuit dealt with an appeal by

Sharyn Solomon, a former employee of the School District of Philadelphia, who

sought reversal of a district court's denial of her motion for a new trial or

alternatively for amendment of a jury verdict entered in favor of the School District

on her ADA accommodation claim. <u>See</u> <u>id.</u> Solomon contended that the School

---

[9]

The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

District "failed to provide her with a reasonable accommodation for her back problems." Id. at 157.

Specifically, Solomon requested "that she be given a first-floor room instead of the second-floor room she previously had or the upstairs room she was assigned." Id. Instead, the School District chose to accommodate Solomon by offering "the use of an elevator to get to her assigned resource room and to go to and from other classrooms." Id. There was ample evidence that Solomon could use the elevator to transport herself as needed and did not require any further accommodation. Id. at 158. As such, the Third Circuit affirmed the district court's denial of Solomon's motion, noting "that this accommodation was reasonable and sufficient." Id. at 157–58. The Plaintiff here, as in Solomon, has not demonstrated a genuine dispute of material fact as to whether Defendant failed to reasonably accommodate her, and summary judgment is therefore granted in favor of Defendant on that claim in full.

Last, the Court must consider whether Plaintiff has alleged a genuine dispute of material fact as to whether Defendant adequately engaged in the interactive process. All signs in this case point toward the conclusion that Defendant acted in good faith, even going beyond the ADA's requirements, but that instead it was Plaintiff who ultimately failed to maintain adequate communication with Defendant or submit the required paperwork. As Defendant also points out,

consideration of an interactive process claim is somewhat superfluous in this matter, given that Defendant fully accommodated Plaintiff with an extensive leave period, contingent only upon Plaintiff supplying the necessary medical documentation. ECF No. 39 at 24–25. Nevertheless, the Court will dispose of it for the sake of completeness.

Defendant estimates that it exchanged communications with Plaintiff at least thirty (30) times, ECF No. 39 at 23. Judging by the parties' statements of facts, ECF No. 24 at 9–14; ECF No. 30 Ex. 1 at 9–11, the Court is convinced that thirty is a reliable estimate. There is obviously no magic number signifying sufficient engagement, as courts prioritize quality of communication over quantity, yet Plaintiff's contention that Defendant failed to engage in the interactive process is seriously undermined by the trail of documents in this case.

Here, the Court incorporates the facts set out in Parts I.B through I.C, supra, of this Memorandum, which detail the many communications exchanged by Plaintiff and Defendant beginning from the time of her first accommodation request in early 2012 up to and including her ultimate failure to supply Defendant with the adequate medical documentation in early 2013. The extent of those communications is too voluminous to copy and recite again verbatim in the same Memorandum. Nevertheless, the sheer number of leave extensions granted in combination with the constant contact Defendant's Leave Department exhibited

when dealing with Plaintiff's requests amount to well more than the minimum

effort required to satisfy its burden under the ADA. All told, the Court tallied

fourteen approved leave extensions in addition to the initial approval of Plaintiff's

first request, as well as a subsequent exchange of at least thirty letters and

telephone calls between Defendant and Plaintiff. Several of those communications

explained to Plaintiff her documentation's shortcomings, the process for correcting

them, how she could contact someone should she have any questions, and the

consequences of her continued failure to act. "As we [the Third Circuit] have noted

here and elsewhere many times, both the employer and the employee have a duty

to act in good faith once the interactive process begins. All the interactive process

requires is that employers make a good-faith effort to seek accommodations."

Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 333 (3d Cir. 2003) (internal

citations omitted). There is no genuine dispute that Defendant acted with the

requisite good faith when processing Plaintiff's requests in this case.

In fact, were it not for Plaintiff's nurse practitioner failing to submit

adequate documentation, and Plaintiff never seeing to it that those shortcomings

were remedied, there is nothing in the record indicating that Defendant would have

been anything other than cooperative when evaluating further leave extension

requests by Plaintiff. A plaintiff cannot, as here, fail on her own end to adequately

engage with her employer. As one court has previously described the required

exchange of information between disabled individuals and their employers in ADA cases, "neither the law nor common sense can demand clairvoyance of an employer." <u>Conneen</u>, 334 F.3d at 331. Instead, an employer only can act on what an employee tells it and only can rely upon the sound judgment of medical professionals when selecting and approving the appropriate leave for a disabled individual.

That minimum level of communication and that requisite medical information was never fully furnished in this case—and through no fault of Defendant's. Whether Plaintiff's nurse practitioner acted negligently or whether it simply was not her sound medical opinion that Plaintiff required continuous leave is beside the point. Plaintiff failed to satisfy the basic requirements that the ADA places on her, and the consequences of that failure fall on her and her alone. Consequently, because Plaintiff has not demonstrated a genuine dispute of material fact as to whether Defendant failed to adequately engage in in the interactive process in good faith, summary judgment is granted in favor of Defendant on that claim in full.

### B. Defendant's Motion for Summary Judgment is granted as to Plaintiff's disparate treatment claim.

Plaintiff's other claim is that Defendant fired her because she was disabled. Because that claim is before this Court on summary judgment, the Court's sole task

is to discern whether Defendant has adequately demonstrated that no genuine dispute as to any material fact surrounding Plaintiff's firing exists. As outlined in Part II and as a straightforward matter of practice, a material fact is one whose truth or falsity can alter the outcome of the litigation as a matter of law. Not all disputed facts are material facts, and not all disputes are genuine disputes for the purposes of the procedural lens through which a district court must assess a motion for summary judgment. Moreover, for a dispute to be genuine, there must be sufficient evidence from which a rational person could find in favor of the party who bears the burden of proof on the contested issue. See Celotex Corp., 477 U.S. at 322.

The core dispute as to Plaintiff's disparate treatment claim is one of causation: Why was Plaintiff fired? Was it "because of" her disability? Of course, causation is a material fact in any employment discrimination suit based upon disability or any protected characteristic. As Defendant notes, causation enters the employment discrimination calculus at no fewer than two distinct junctures: first, as an element of a plaintiff's prima facie case and second, as a means of determining whether a defendant's proffered nondiscriminatory justification was mere pretext. ECF No. 23 Ex. 3 at 10.

Even given that causation will nearly always be a material fact in employment discrimination disputes, it takes a greater showing on a plaintiff's part

to adequately allege that a causal fact is in <u>genuine</u> dispute. To appropriately gauge whether an employment discrimination claimaint has alleged sufficient evidence to engender a genuine dispute as to causation, the Third Circuit has adopted the familiar <u>McDonnell Douglas</u> burden-shifting framework. <u>See</u> <u>Williams v. Philadelphia Hous. Auth. Police Dep't</u>, 380 F.3d 751, 759 (3d Cir. 2004) (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)); <u>Keyes v. Catholic Charities of the Archdiocese of Philadelphia</u>, 415 F. App'x 405, 408 (3d Cir. 2011) ("Because he proceeds based on circumstantial evidence, he must put forth evidence that meets the <u>McDonnell Douglas</u> requirements.").

As the Third Circuit has outlined:

> Briefly summarized, the <u>McDonnell Douglas</u> analysis proceeds in three stages. First, the plaintiff must establish a <u>prima facie</u> case of discrimination. If the plaintiff succeeds in establishing a <u>prima facie</u> case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Our experience is that most cases turn on the third stage, i.e., can the plaintiff establish pretext.

<u>Williams</u>, 380 F.3d at 760 n.3 (internal citations omitted).

The Court holds that there is no genuine dispute of material fact that Plaintiff failed to adequately establish the elements of her <u>prima facie</u> case. Equally

relevant, the Court also holds that Defendant has proferred a legitimate, nondiscriminatory justification, which Plaintiff has failed to show was merely pretextual.

In order to establish a <u>prima facie</u> case of disability discrimination, a plaintiff must show that "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999) (quoting <u>Gaul</u>, 134 F.3d at 580). The parties agree that pregnancy-related complications, such as round-ligament syndrome and postpartum depression, constitute "disabilities" as contemplated by the ADA, even if pregnancy is not a qualifying disability. <u>See</u> <u>Oliver v. Scranton Materials, Inc.</u>, No. 3:14-CV-00549, 2015 WL 1003981, at *8 (M.D. Pa. Mar. 5, 2015) (Mariani, J.) ("In light of this background, the Court cannot find that Plaintiff's alleged 'pregnancy-related complications' do not give rise to an ADA claim as a matter of law."); <u>Smith v. Ctr. For Organ Recovery &</u> <u>Educ.</u>, No. CIV.A. 13-428, 2013 WL 4049550, at *1 (W.D. Pa. Aug. 9, 2013) (internal citations omitted) ("While pregnancy is not considered a disability under the ADA or PHRA, disabling physiological disorders related to an abnormal pregnancy might be protected under the ADA.").

To the contrary, Plaintiff has failed to adequately show either that she suffered an "adverse employment decision" or that the alleged adverse action was "a result of discrimination." Plaintiff's primary contention as it relates to the adverse action element is that "the privileges of her employment (i.e. the leave policy) were significantly disrupted by Defendant's actions" because she "received a termination letter" and because "Montrose failed to follow up . . . ." ECF No. 30 at 10. As a threshold matter, the termination letter was sent on January 28, 2013, after which time Plaintiff remained on leave and in contact with Defendant's Leave of Absence Department. Accordingly, it does not appear to this Court that the allegedly errant termination letter had any effect whatsoever on Plaintiff's "privileges of her employment"—rather, it seems as though Plaintiff and the Leave Department continued to engage in the kinds of communications regarding leave extension requests and submission of documentation that they had been exchanging all along.

Further, contrary to Plaintiff's suggestion that she "reasonably believed her position was terminated" upon receiving the letter, it is undisputed that Plaintiff called Defendant's Leave Department the day she received the letter and asked whether she should still submit the documentation supporting her leave. Defendant's Leave of Absence Department told her that she was still to submit the documentation and would reiterate these instructions on at least one subsequent

occasion. On that same call, Plaintiff also asked the Leave of Absence Department to extend her leave through February 4, 2013 because her doctor was on vacation and had lost the paperwork. None of the factual circumstances thus far alleged suggest that either party was operating under a reasonable belief that Plaintiff's employment had been terminated. By definition, terminated employees do not require leave extensions, and employers do not instruct terminated employees to continue supplementing their leave extension documentation.

Last, in Weisel v. Stericycle Commc'ns Solutions, No. 3:13-CV-3003, 2015 WL 390954, at *15 (M.D. Pa. Jan. 28, 2015), Judge Richard P. Conaboy, writing for this Court, granted summary judgment in favor of an employer on an ADA claim under very similar factual circumstances. Weisel involved a claim by an employee who allegedly believed she had been terminated when her employer sent her a mistaken email mandating that she supply certain medical information or face termination. Id. at *4. The plaintiff in Weisel attempted to further support her claim on the basis that she sent a response email to her employer, and no one "ever responded to the Plaintiff to tell her that she was not fired." Id. at *13 (emphasis in original). Judge Conaboy rejected that line of argument, noting that "although no [ ] representative specifically used the words 'you are not fired,' communication with Plaintiff made it abundantly clear that she had not been terminated." Id. Plaintiff's argument, Judge Conaboy reasoned, "[was] contradicted by the record."

Id. In fact, as in this case, the defendant in Weisel had contacted the plaintiff

"about her return to work." Id. (emphasis in original). "[Defendant's] email makes

clear that [plaintiff] had not been fired for any reason and the key to her continued

employment was contacting her employer." Id.

Moreover, the Court holds that Plaintiff has failed to adduce sufficient

evidence demonstrating that she suffered any adverse action "as a result of" or

"because of" her disabilities. ADA "[p]laintiffs must prove that they were treated

differently based on the protected characteristic, namely the existence of their

disability." CG v. Pennsylvania Dep't of Educ., 734 F.3d 229, 236 (3d Cir. 2013).

This requires a showing that the disability "played a role in the employer's

decisionmaking process and that it had a determinative effect on the outcome of

that process." New Directions Treatment Servs. v. City of Reading, 490 F.3d 293,

301 n.4 (3d Cir. 2007). Though the Court believes that this analysis has a tendency

to merge with the pretext inquiry, it must fully address Plaintiff's allegations.

Plaintiff argues that Defendant had reached an internal "breaking point" and

that Montrose's mailing of the termination letter was a result of Plaintiff's

extensive leave requests (and therefore, of her disabilities). ECF No. 30 at 12.

There are two shortcomings with that theory. First, the record is bereft of any

evidence suggesting that Defendant had reached a "breaking point" with regard to

Plaintiff's disabilities. Quite the opposite, the record demonstrates that Defendant

was willing to continue accommodating Plaintiff, _ad infinitum_, so long as Plaintiff

simply submitted adequate documentation. Moreover, Montrose filed a sworn

affidavit, in which she stated that:

> On or around January 28, 2013, I instructed Human Resources
> Specialist Becky Gaffney to send a termination letter to Nicole Moore.
> At that time, I had not reviewed any medical documentation
> concerning Ms. Moore. I had no information about her medical
> condition and I did not know she was disabled. I based my decision to
> send the letter solely on (1) emails that I had received from the leave
> of absence department stating that Ms. Moore's leave had expired;
> and (2) my own knowledge that Ms. Moore had not returned to work.

ECF No. 39 at 49.

This explanation is supported by the fact that Montrose was employed in

Defendant's Human Resources Department, not in its Leave of Absence

Department, and had only been in the position for approximately five months at

that time. Thus, the Court finds that Plaintiff has not pointed to sufficient evidence

suggesting that Montrose was aware of Plaintiff's disability at the time the

contested termination letter was sent. See Geraci v. Moody-Tottrup, Int'l, Inc., 82

F.3d 578, 581 (3d Cir. 1996) (Nygaard, J.) ("We cannot presume that an employer

most likely practiced unlawful discrimination when it did not know that the

plaintiff even belonged to the protected class. The employer's knowledge, in this

class of cases, is a critical element of the plaintiff's prima facie case. Indeed, it is

counter-intuitive to infer that the employer discriminated on the basis of a

condition of which it was wholly ignorant, and in this situation the bare McDonnell

Douglas presumption no longer makes sense.").

Though its analysis could stop with Plaintiff's failure to establish a prima facie case, the Court, for the sake of completeness, next examines Defendant's legitimate, nondiscriminatory justification for the issuance of the termination letter. Specifically, "Montrose testified that she sent the Letter solely because she believed that Plaintiff's leave had expired and she had not returned to work." ECF No. 39 at 10.

"The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500–01 (3d Cir. 1997) (internal citations and quotations omitted). The Court is satisfied that the Defendant has met its limited burden of "articulation" by offering that Montrose made the decision to execute the termination—not because of Plaintiff's disabilities—but because Montrose believed Plaintiff had failed to adequately supply the required documentation necessary to extend her leave and thereafter did not return to work.

Lastly then, the Court must consider whether Defendant's alternative nondiscriminatory justification was merely pretext. As the Third Circuit has explained regarding the pretext stage:

To show pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." When a plaintiff challenges the "credibility of the employer's proffered justification," he must produce evidence "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." The plaintiff "must show[ ] not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."

Proudfoot v. Arnold Logistics, LLC, No. 14-4703, 2015 WL 5881530, at *3 (3d Cir. Oct. 8, 2015) (internal citations omitted) (upholding Chief Judge Christopher C. Conner's grant of summary judgment in favor of defendants as to the absence of pretext in an ADA claim because "slight inconsistencies as to who made the ultimate decision to terminate [plaintiff] do not demonstrate that the reason provided for his termination was pretextual"; "[defendant's] reason for firing [plaintiff] has not changed"; and "[plaintiff] has thus failed to show that a reasonable juror would find [defendant's] reason for firing him to be 'so plainly wrong' . . . that it is 'unworthy of credence'").

Plaintiff's narrative depicts a drained Montrose, worn by Plaintiff's many leave requests, spitefully sending Plaintiff the termination letter to put an end to all of the aggravation that Plaintiff has caused Defendant. The problem with that history is that there are simply insufficient facts supporting it—and certainly

insufficient facts for that hypothesis to create a genuine dispute precluding summary judgment.  Based on the record, the Court neither disbelieves Defendant's nondiscriminatory justification nor believes Plaintiff's charge of discriminatory animus for the several reasons that follow.

First, the Court has little reason to doubt Montrose's affidavit or deposition testimony, which support Defendant's contention that nothing more than the belief that Plaintiff had exhausted her leave and failed to adequately re-apply for its extension animated the mailing of the termination letter. After all, Montrose's belief that Plaintiff was not in conformity with Defendant's leave requirements was quite understandable based upon the vast number of notices Plaintiff had received indicating her leave paperwork was incomplete or inconsistent. What's more, given that Montrose was employed in Defendant's Human Resource Department, the Court finds it probable that, as she testified, she was not involved with the day-to-day leave determinations and disability paperwork handled by the Leave of Absence Department.

Further, Defendant's explanation has remained consistent throughout, as in Proudfoot; here, Plaintiff has failed to show that Defendant's proffered justification was "so plainly wrong" that it was "unworthy of credence." Id. See also Fuentes, 32 F.3d at 763 (affirming a grant of summary judgment in a national origin employment discrimination case at the pretext stage because plaintiff could not

"point[ ] to evidence from which a factfinder could reasonably conclude that discrimination was the more likely cause of his discharge" and because "the fact that the relevant decisionmakers disagree about the plaintiff's qualifications [did] not evidence discrimination"); Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC, 58 F. Supp. 3d 446, 469 (M.D. Pa. 2014) (Conner, C.J.) (granting summary judgment on an ADA claim in favor of employer where "[n]otwithstanding [a] potential inconsistency," plaintiff failed to "discredit [defendant's position" that employee's "absence . . . was the primary reason . . . for her dismissal.").

In addition, Plaintiff has not adduced any facts suggesting that anti-pregnancy discrimination pervaded Defendant's standard practices. For instance, Plaintiff testified that no one in Defendant's organization ever made any negative comments to her about her disabilities. ECF No. 24 at 27; ECF No. 30 Ex. 1 at 20. She also testified that she was unaware of anyone in Defendant's organization ever making any negative comments about anyone else's disabilities. . ECF No. 24 at 27; ECF No. 30 Ex. 1 at 20.

Finally, and quite telling, the simple truth behind this case is that an employer who extends an employee's leave approximately fifteen times and engages in approximately thirty communications with that employee in an effort to assist her in the submission of the appropriate paperwork is not an employer who is discriminating. If Defendant's true purpose in Plaintiff's case was ever to

discriminate against her on the basis of her pregnancy, then it did an exceedingly poor job of it. At some point, an employee must take responsibility for her own shortcomings, rather than attempt to shift the blame to her doctor, nurse practitioner, or employer.

## IV. CONCLUSION

There are bound to be disputes of fact in any case. After all, that is why the parties have proceeded to litigation. However, disputes of fact must be <u>genuine</u> to preclude summary judgment—factually unsupported narratives about an employer's "discriminatory animus" do not suffice without more. If it were otherwise, summary judgment would never be appropriate in litigation. At the same time, this Court remains mindful of the mandate that prevents it from making credibility determinations or weighing the evidence at this stage. That mandate does not, however, foreclose a district court's ability to dispose of those claims about which no <u>genuine</u> dispute of material facts exists. This is one such case. As the Honorable Charles E. Clark of the United States Court of Appeals for the Second Circuit and chief draftsman of the Federal Rules of Civil Procedure once noted:

> If one may thus reserve one's evidence when faced with a motion for summary judgment there would be little opportunity 'to pierce the allegations of fact in the pleadings' or to determine that the issues formally raised were in fact sham or otherwise unsubstantial. It is hard to see why a litigant could not then generally avail himself of this means of delaying presentation of his case until the trial. So easy a

> method of rendering useless the very valuable remedy of summary
> judgment is not suggested in any part of its history or in any one of
> the applicable decisions.

Engl v. Aetna Life Ins. Co., 139 F.2d 469, 473 (2d Cir. 1943). The Court holds that

application of this "very valuable remedy" is more than proper in this case.

An appropriate Order follows.

BY THE COURT:

/s Matthew W. Brann
Matthew W. Brann
United States District Judge